## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

MURIELLE ABDALLAH, Individually
and on Behalf of All Other Persons
Similarly Situated,

     Plaintiff,

  vs.

BAIN CAPITAL LLC,

     Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)

**CIVIL ACTION NO.**

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiff Murielle Abdallah, individually and on behalf of all other persons similarly

situated, by her undersigned attorneys, for her complaint against Defendant,

alleges the following based upon her personal knowledge as to herself and her

own acts, and information and belief as to all matters, based upon, *inter alia*, the

investigation conducted by and through her attorneys, which included, among

other things, a review of the Defendant's public documents, information readily

obtained on the Internet, press releases, papers from a previous litigation in

France, and third-parties affidavits. Plaintiff has substantial evidentiary support

for the allegations set forth herein.

## NATURE OF THE ACTION

1. This is a federal class action on behalf of a class all consisting of persons

 who were employees of a factory located in Hénin-Beaumont, France, whose

 employment was terminated as a result of Defendant's tortious acts.

1

## JURISDICTION AND VENUE

2. This Court has jurisdiction over this class action pursuant to 28 U.S.C. §1332 in that:

   (a) Plaintiff is a citizen of France.

   (b) Defendant is a corporation incorporated under the laws of the State of Delaware and has its principal executive offices at 111 Huntington Avenue, Boston, Massachusetts 02199.

   (c) At least one member of the class of plaintiffs is a citizen of a State different from the Defendant within the meaning of 28 U.S.C. §1332(d)(2)(A).

   (d) The claims asserted by the plaintiff class, aggregated as required by 28 U.S.C. §1332(d)(6), exceed the sum of $5,000,000 within the meaning of 28 U.S.C. §1332(d)(2).

   (e) The class of unnamed plaintiffs exceeds 100 in number within the meaning of 28 U.S.C. §1332(d)(5)(B).

   (f) The Defendant is not a State, a State official, or any other governmental entity within the meaning of 28 U.S.C. §1332(d)(5)(A).

3. Venue is proper in this District pursuant to 28 U.S.C §1391(a)(1) as Defendant's principal executive offices are located within this District.

4. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendant, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail and interstate telephone communications.

## PARTIES

5. Plaintiff was an employee of a factory formerly owned and operated by Samsonite. Plaintiff has been damaged consequent to the termination of her employment.

6. Defendant, at all relevant times herein, was the principal shareholder of Plaintiff's employer, Samsonite.

7. Defendant, while the main shareholder of Samsonite:

   (a) dominated the management of Samsonite;

   (b) instigated an asset strip of part of Samsonite, causing the termination of Plaintiff's employment in violation of French law.

## PLAINTTIFF'S CLASS ACTION ALLEGATIONS

8. Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of former employees of a factory located in Hénin-Beaumont, France, which was owned an operated by Samsonite and whose employments were terminated as a result of Defendant tortious acts.

9. The members of the Class are so numerous that joinder of all members is impracticable.

10. Plaintiff alleges that this class of persons consists of 186 persons.

11. Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendant's wrongful acts.

12. Plaintiff Murielle Abdallah will fairly and adequately protect the interests of the members of the Class and has retained competent and experienced counsel.

13. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    (a) Whether Defendant, by instigating an asset strip of Samsonite which ultimately caused the wrongful termination of the employment of the members of the Class, defrauded the members of the Class.

    (b) Whether Defendant, in his status of main shareholder of Samsonite, the employer of the members of the Class, tortiously interfered with the employment agreements of the members of the Class, thereby causing the termination of the employment of all the members of the Class; and

    (c) Whether Defendant, by instigating an asset strip of Samsonite which ultimately caused the wrongful termination of the employment of the members of the Class, committed an unfair act in the conduct of trade, in violation of Massachusetts General Laws, Chapter 93 A §2(a).

14. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. There will be no difficulty in the management of this action as a class action.

15. Plaintiff contends that the claims set out below are proper for certification as a class action under the provisions of Rule 23 (b)(3).

## STATEMENT OF FACTS

### The Hénin-Beaumont Site

16. Plaintiffs were employees of a luggage factory, located in Hénin-Beaumont, France.

17. From inception in 1984 until the fall of 2005, the factory had been owned and operated by Samsonite, employing over two hundred (200) workers.

18. The factory manufactured injection molded plastic suitcases exclusively for the various Samsonite brands.

### Bain Capital LLC Becomes Samsonite's Main Shareholder

19. In 2004, Bain Capital (hereafter "Bain") was the main and active participant of an investors' pool, also consisting of Ares Management and Ontario Teacher Pension Funds. The pool purchased approximately eighty-five percent (85%) of Samsonite's outstanding shares, for a total price of eight million dollars ($8,000,000). The market value of one share was, then, one cent ($0.01).

20. Bain, one of the world's leading private investment firms, concentrates in the acquisition of major retailers and consumer companies around the world. Bain's strategy consists of acquiring control of a company, appointing a management team, so as to restructure the acquired company by disposing of burdensome assets and maximize profits, with a view towards mid-term resale at a substantial gain.

21. Shortly after the acquisition, Bain appointed Marcello Botolli as CEO of Samsonite, who was in charge of implementing the new strategy.

5

**Legal Requirements under French Law in Case of Collective Dismissal**

22. The provisions of the French Labor Code requires any individual or entity employing a minimum of fifty (50) workers and seeking to terminate the employment of a minimum of ten (10) workers to implement a collective redundancy plan.

23. The aim of such plan is to mitigate the consequences to the workers of the economical difficulties faced by the employer, and promotes reassignment of the workers to different positions within the company, or failing that, retraining.

24. To that end, a collective redundancy plan must contain a number of financial provisions designed to assist the workers facing termination, including but not limited to training seminars and conference, financial and logistical aid to move to a different location to be reallocated to a new position, and psychological support to help the workers during the transition period.

25. For companies that are subsidiaries of larger corporate groups, the scope of the employer's duty of reassignment encompasses the entire group. Therefore, the employer has an obligation, to a reasonable extent, to reallocate the dismissed workers to different positions within the group, or train them to maximize their chances of external hire.

26. For an American group similar to Samsonite in size and results, the costs of a collective redundancy plan to dismiss some two hundred (200) employees of a French subsidiary would be in the region of seventy-five million dollars

($75,000,000). Such figure would need to be provisioned, and entered on the consolidated accounting books of the company as a liability.

## The Sale of the Hénin-Beaumont Factory

27. In 2004, because of a shift on the luggage market towards softer materials, the factory was operating at only fifty percent (50%) of its capacity. Samsonite had already started to delocalize its production and manufacturing activities to China and Eastern Europe, in order to reduce labor costs.

28. In 2005, despite skyrocketing profits, Samsonite presented the representatives of the factory's employees with a takeover plan promoted by HB Group, a shell company owned and operated by Jean-Jacques Aurel (hereafter "Aurel"), a self-proclaimed entrepreneur from Luxembourg. Aurel was brought to Samsonite by Bain, which strongly supported his takeover plan. The takeover plan outlined a progressive conversion of the factory towards the production of solar panels and unbranded luggage.

29. In September 2011, new evidence came to light, demonstrating that Bain specifically mandated Patrick Lebreton (hereafter "Lebreton"), a high-ranking executive of Bain, to attend to every important meeting between Samsonite and Aurel, during which the scheme was formulated and furthered. Over the course of these meetings, Samsonite's representative (with whom Lebreton was well acquainted) repeatedly sought Lebreton's assent to the main points of the scheme.

30. Aurel was intimately familiar with this kind of plan to circumvent French law and deny employees proper compensation, as he had already acquired a

French factory owned by Delsey, Samsonite's main competitor, with a similar takeover plan using a different shell company under his ownership and control. The fraudulent operation in the Delsey case resulted in the liquidation of the factory, and the dismissal of over two hundred (200) employees (for which Delsey has since been found liable).

31. Bain specifically brought Aurel to the equation as he had, at that time, successfully completed a similar transfer on behalf of Delsey, in the same region, resulting in mass unemployment and large savings for Delsey.

32. As mandated by the provisions of the French Labor Code, a company seeking to transfer an entity under its control must consult the employees' representatives on the planned transfer.

33. Concerned by the takeover plan, which only consisted of a one-page business plan containing several inaccuracies, and despite the interesting perspectives of a new activity, the employees' representatives hired a Certified Public Accountant firm to conduct an audit.

34. In its report, the accounting firm alerted the employees of the crucial need to obtain additional information, as the plan was extremely opaque and lacked proper supporting documentation. The acquirers, supported by Bain, justified this lack of documentation by a purported necessity to maintain absolute confidentiality. Such a lack of documentation is extremely unusual when dealing with a plan aiming at transferring around two hundred (200) employment agreements. The auditors also voiced their skepticism as to the contemplated time frame. Lastly, the accounting firm highlighted the marked

similarity of the intended takeover with the infamous Delsey case (*supra* §
28), which resulted in the dismissal of over two hundred (200) employees.

35. The conclusion of the report voiced caution about the viability of the plan,
which forecasted a quick growth of the solar panels and the unbranded
luggage manufacturing activities. These two activities, which did not exist as
of the summer of 2005, were anticipated to replace the entirety of the
Samsonite activities, and so in less than two years. No credible evidence
supported these ambitious allegations.

36. In addition, the report emphasized the costs for Samsonite of closing the
factory, which would be a minimum of ten million Euros (€10,000,000), which
raised serious doubts as to the real objectives of the takeover.

37. Upon receiving the audit report from the accounting firm, the employees'
representatives were extremely reticent to approve the takeover plan.
However, the prospective acquirers raised high expectations amongst the
personnel of the factory by giving assurances as to the safety of their
employment, which made it extremely difficult for the employees'
representatives to oppose the takeover plan.

**The Fraudulent Scheme: Separating the Factory from the Rest of**

**Samsonite Group**

38. To carry out the takeover, Samsonite first created a wholly-owned subsidiary,
in to which the factory was transferred together with all of the factory's
business activities and assets, including the employees.

9

39. In addition, Samsonite assumed all of the costs to be incurred by HB Group, Aurel's shell company, in relation to the takeover.

40. As part of the transfer, Samsonite undertook to provide the factory with financial aid in the amount of nine million two hundred twenty-eight thousand nine hundred ninety-four Euros (€9,228,994), as follows:

   (a) A grant of four million Euros (€4,000,000);

   (b) A loan of four million two hundred twenty-eight thousand nine hundred ninety-four Euros (€4,228,994);

   (c) An advance of one million Euros (€1,000,000).

41. A portion of the grant (two million eight hundred thousand Euros (€2,800,000)) was immediately paid; the remaining part (one million two hundred thousand Euros (€1,200,000)) was never paid.

42. The advance mentioned in (c) above was a golden handshake paid to HB Group, in consideration for saving the costs of a collective redundancy plan that Samsonite would have to assume.

43. The loan mentioned in (b) above was also transferred by Samsonite to HB Group, which enabled the HB Group to repay itself nine hundred twenty thousand Euros from the factory, as "anticipated reimbursement."

44. Lastly, Samsonite requested and obtained from HB Group a one million eight hundred thousand Euro (€1,800,000) guaranty payable at first demand. In return, the factory, then managed by Samsonite-Bain appointed executives, had to block one million eight hundred thousand Euros (€1,800,000).

45. The factory, now a wholly-owned subsidiary of Samsonite, was subsequently sold to HB Group, through a complex series of transactions (some dated July 29, 2005 and some others dated August 31, 2005) for a peppercorn consideration of one Euro (€1).

46. A careful reading of the terms of this series of agreements reveals not only the total absence of a commercially viable plan relating to the transfer of the factory's activities, but also the fraudulent intent of the parties to the agreement.

47. The economics of the scheme can be summarized as follows:

   (a) Samsonite injected around seven million Euros (€7,000,000) into the transfer;

   (b) HB Group received approximately two million Euros (€2,000,000);

   (c) The remaining five million Euros (€5,000,000) were allocated to the factory, but one million five hundred thousand Euros (€1,500,000.00) were embezzled for the benefit of two entities, namely FES and ESF, under very blurred circumstances; another one million eight hundred thousand Euros (€1,800,000) were blocked for the guaranty payable at first demand requested by Samsonite.

48. Therefore, the sum ultimately available to the factory was only about two million Euros (€2,000,000).

49. To lend a veil of commerciality, Samsonite, under Bain control, concluded an unbranded manufacturing agreement with the factory. This unbranded agreement was intended partially to maintain the operations of the factory.

However, the conditions of sale of the unbranded production imposed by Samsonite were coercively unviable:

(a) The factory was not allowed to sell the unbranded luggage via traditional lines of distribution (i.e., department stores and traditional retailers).

(b) The factory was not allowed to sell the unbranded luggage in Germany, Belgium, Spain and France until December 31, 2005; and in Canada and the United States until August 2009.

50. For Bain, the ultimate objective of this transfer was clearly to facilitate the termination of the worker's employment agreements, by saving all the costs of a collective redundancy plan, therefore increasing the share price of Samsonite and facilitating a resale at a tremendous premium (over one billion six hundred million dollars ($1,600,000,000)). If those costs had been incurred by Samsonite and entered on Samsonite's consolidated accounting books, Samsonite would not have posted any profits in 2006, and Bain would not have been in a position to close on a resale for a ten-figure price.

**Consequences of the Fraudulent Sale: The Liquidation of the Factory**

51. The operating results of the factory were disastrous. After a few weeks, the lack of industrial viability of the project came to light. The solar panel activity, in particular, which was supposed to generate three to four million Euros (€3,000,000 to €4,000,000) of gross profits in 2006, and twelve million Euros (€12,000,000) in 2007, had not created any revenue for the company. This new activity was never properly funded.

52. The unbranded luggage manufacturing activity was supposed to generated three million Euros (€3,000,000) of gross profits in 2006, and twelve million Euros (€12,000,000) in 2007. In fifteen (15) months, it had only created two hundred twenty-eight thousand Euros (€228,000) in revenue. Until the order of dissolution, the factory was operating almost solely on orders from Samsonite, which were contractually to end in February 2007.

53. One year after the transfer, the factory filed for bankruptcy. Eventually, in a decision dated February 15, 2007, the Tribunal de Commerce of Paris, France, ordered the judicial liquidation of the factory.

**Bain Resells Samsonite for a Significant Profit**

54. The transfer was of substantial benefit for Samsonite. In 2006, despite an accounting of eleven million dollars ($11,000,000) representing the costs of the fraudulent scheme, Samsonite generated over seventy-three million dollars ($73,000,000) net profits. This caused the stock price to jump. Such profits would not have been generated if Samsonite had had to bear the costs of liquidation of the factory and termination of its workers, which would have been in the range of seventy-five million dollars ($75,000,000). *Supra* §26.

55. In the summer of 2007, Bain and the other shareholders sold Samsonite to CVC Capital Partners, for around one billion seven hundred million dollars ($1,700,000,000), including the assumption of debt. The market price of a share was at that point one dollar and forty-nine cent ($1.49).

56. Bain and its affiliates have therefore realized a profit of over one billion six hundred million dollars ($1,600,000,000).

## Various Proceedings in France

57. The workers filed a lawsuit against Samsonite, HB Group, Bain Capital, Ares Management, and the Ontario Teachers' Pension Plan, to declare the transfer null and void on the grounds of fraud.

58. In a decision dated June 24, 2008, the Tribunal de Grande Instance of Béthune, France, found in favor of the workers, and declared the transfer between Samsonite and HB Group null and void as fraudulent. The claims against Bain and the other members of the investors' pool were dismissed for lack of evidence. Plaintiff did not have access to the new evidence that came to light in September 2011 (see §29 supra). Therefore, such evidence was never presented to the Tribunal de Grande Instance of Béthune.

59. In addition, the workers also filed a lawsuit against Samsonite, on the grounds of illegal termination of employment as a consequence of the violation of mandatory labor law provisions governing collective dismissal.

60. In a decision dated December 14, 2008, the Conseil des Prud'hommes of Lens, France, found that Samsonite had never stopped to be the actual employer of the workers, and awarded the workers damages.

61. Lastly, Aurel and his partners were indicted on counts of fraud, embezzlement, and bankruptcy.

62. In a decision dated June 8, 2009, the Tribunal Correctionnel of Paris, France, found Aurel and his partners guilty on all counts. Aurel was sentenced to a three-year term of imprisonment.

## CAUSES OF ACTION

### COUNT I

### FRAUD

63. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

64. Bain made a series of false representations of material facts, with knowledge of their falsity, when elaborating a scheme destined to circumvent mandatory French law provisions protecting employees of illegal termination. These representations were contained in all the documents surrounding the transfer of the Hénin-Beaumont factory to the sham HB Group. In particular, all the prospective changes that were supposed to maintain the activity of the factory were false, and Bain was well aware of the falsity of such information.

65. Plaintiff relied upon these representations as true, and acted upon them to her damage. When the employees' representatives were asked their opinion on the contemplated project of transfer, they genuinely believed in the project promoted by the "Bain-sponsored" HB Group, which raised high expectations among the employees. Therefore, the employee's representatives were not able to oppose the project. Plaintiff's reliance upon these misrepresentations caused her significant damage, as her employment was ultimately

terminated, without an adequate and legally-compliant collective redundancy plan to facilitate her securing of a new employment.

## COUNT II

## TORTIOUS INTERFERENCE WITH THE EMPLOYMENT AGREEMENTS

66. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

67. Until termination of her employment agreement, Plaintiff had a business relationship of economic benefit with Samsonite.

68. At all relevant times, Bain was the controlling shareholder of Samsonite as alleged herein. By virtue of its position, stock ownership, participation in and/or awareness of Samsonite's operations, Bain had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Samsonite, including the elaboration of a scheme intended to terminate Plaintiff's employment in blatant violation of the mandatory provisions of the French Labor Code.

69. As set forth above, Bain had knowledge of the existing business relationship of economic benefit between Plaintiff and Samsonite.

70. As set forth in this complaint, Bain introduced Mr. Aurel to Samsonite, who later acquired the factory through the means of a fraudulent scheme, for which he was criminally convicted. Bain also appointed Samsonite's new management team, with the sole objective to implement Bain's restructuring

strategy, which ultimately led to the termination of Plaintiff's employment as a result of the fraudulent transfer of the factory.

71. As set forth above, new evidence that came to light in September 2011 revealed that Bain initiated and oversaw the process that culminated in the fraudulent transfer of the factory, causing Plaintiff's employment to be terminated.

72. By virtue of these actions, Bain induced Samsonite to terminate the contract, thereby intentionally and improperly interfering with Plaintiff's employment agreement with Samsonite.

73. As alleged in this complaint, Bain's sole motive in so interfering was to circumvent Samsonite's legal obligation to implement a collective redundancy plan, as mandated by the French Labor Code. Obviating this legal obligation saved a significant amount of money for Samsonite. By realizing such a tremendous saving, Samsonite was able to post significant profits subsequent to the transfer of the factory, instead of entering a provision in their consolidated accounting books. Had such provision been entered in the books to reflect the necessary costs of a legally compliant collective redundancy plan, Samsonite would not have posted a profit. Such profit posted by Samsonite enabled Bain to resell its controlling stake in Samsonite for a significant gain of over one billion dollars. In no event would Samsonite have been able to post any profits had they complied with their legal obligations. Absent profits for Samsonite, Bain would not have resold its controlling stake in Samsonite for such tremendous premium.

74. As a direct and proximate result of Bain's tortious acts, Plaintiff suffered damages as a consequence of the termination of her employment with Samsonite, and was deprived of all the benefits and financial value inherent to a collective redundancy plan.

## COUNT III

## VIOLATION OF MASSACHUSETTS GENERAL LAWS,

## CHAPTER 93 A § 2(a)

75. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

76. As set forth above, Bain instigated an asset strip of Samsonite, of which it was the main shareholder. In doing so, Bain's only objective was to circumvent Samsonite's legal obligation to implement a collective redundancy plan, as mandated by the French Labor Code.

77. As set forth above, by obviating this obligation, Samsonite was able to post a profit, which allowed Bain to resell its controlling stake for a tremendous premium.

78. To maximize profits to the detriment of the stability and employment of Plaintiff, it is unquestionable that Bain's actions are well within the penumbra of unfairness.

79. In addition, Bain's actions were clearly immoral, unethical, oppressive and unscrupulous. As a matter of fact, Bain did not consider at any time safeguarding the employment of Plaintiff, nor did it care about allowing

Plaintiff the benefits of a legally-compliant and adequate collective redundancy plan.

80. Therefore, Bain's deplorable conduct caused substantial injury to Plaintiff, who did not only lose her employment, but who was also deprived of all the benefits and financial value inherent to a collective redundancy plan.

81. Consequently, Bain's actions constitute an unfair act in the conduct of commerce, in violation of Massachusetts General Laws, Chapter 93 A §2(a).

#### COUNT IV

### UNJUST ENRICHMENT, RESTITUTION AND CONSTRUCTIVE TRUST

82. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

83. Bain has benefited from their fraudulent and unlawful acts alleged in this Complaint. Bain's financial benefits, which result from their fraudulent and unlawful actions, are traceable to defendant's scheme to transfer the factory that was employing Plaintiff to a sham entity, knowing that such scheme would save Samsonite the costs of an adequate collective redundancy plan, thereby allowing Samsonite to post a profit in its consolidated accounting books.

84. The high-premium resale that was made possible by the scheme has conferred upon Bain an economic benefit in the nature of substantial profits from the resale of their controlling stake in Samsonite, to the economic detriment of Plaintiff and the members of the Class.

85. The economic benefit derived by Bain through the fraudulent scheme is a direct and proximate result of Bain's unlawful and fraudulent acts.

86. It would be inequitable for Bain to be permitted to retain any of the revenue derived from its unfair and unlawful acts and trade practices as alleged in this Complaint.

87. Bain should be compelled to disgorge into a common fund for the benefit of Plaintiff and the members of the Class all unlawful or inequitable proceeds received by them which they are holding constructively on trust for all sums unlawfully or inequitably received by defendants traceable to the fraudulent scheme.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action, designating Plaintiff as lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

(b) Awarding compensatory and punitive damages in favor of Plaintiff and the other Class members against the Defendant, for all damages sustained as a result of Bain's wrongdoings, in an amount to be assessed at trial, but believed to be in excess of fifteen million dollars ($15,000,000.00) including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses

incurred in this action, including attorneys' fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff hereby demands a trial by jury

of all the claims asserted in this Complaint so triable.

Dated: November 1, 2011

Respectfully submitted,

By:

Ken Solomon
Attorney-in-Charge
Mass. Bar No. 472730
D. Mass. No. solo3854
kensol001@verizon.net

111 Redington Street
Swampscott, MA 01907
Phone: (781) 929-4113
Fax:    (781) 595-5855

*Attorney for Plaintiff*

Of Counsel:

Robert Garson
*Motion for Pro Hac Vice Submitted*
rg@gs2law.com
Thomas Ségal
*Motion for Pro Hac Vice Submitted*
ts@gs2law.com
GARSON, SÉGAL, STEINMETZ, FLADGATE LLP
164 West 25th Street, Suite 11 R
New York, NY 10001
Tel:   (212) 380-3623
Fax:  (347) 537-4540